**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,** | **Civil Action No. 12-cv-700** |
| **Plaintiff,** | **(Jury Trial Demanded)** |
| **v.** | |
| **COMMONWEALTH ADVISORS, INC. and WALTER A. MORALES,** | |
| **Defendants.** | |

**COMPLAINT**

Plaintiff U.S. Securities and Exchange Commission (the "Commission"), for its Complaint against Commonwealth Advisors, Inc. ("Commonwealth") and Walter A. Morales ("Morales") (collectively, "Defendants"), alleges as follows:

**SUMMARY OF ALLEGATIONS**

1.      Since at least 2007, Commonwealth, a Louisiana investment adviser and Morales, its principal, engaged in a scheme to hide losses in certain hedge funds they advised.  These losses were realized, in part, from significant investments that the funds held in residential mortgage-backed securities ("RMBS") which had deteriorated in value during the recent downturn in the residential housing market.  To hide these losses, Defendants executed improper trades across the funds ("cross-trades") that benefitted certain clients at the expense of other clients.  Defendants also made materially false representations to investors about the amount and value of, as well as the process for valuing certain mortgage-backed assets held in the funds and fabricated internal documents to justify the false valuations.

2.      By virtue of the foregoing conduct and as alleged further herein, the Defendants, directly or indirectly, singly or in concert, have engaged in acts, practices, schemes and courses of business that violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)], and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].  Defendants' conduct also violated Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§80b-6(1)-(4)] and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8].  In addition, Commonwealth violated Sections 204, 206(4), and 207 of the Advisers Act [15 U.S.C. §§ 80b-4, 80b-6(4), and 80b-7] and Rules 204-2, 206(4)-2, and 206(4)-7 thereunder  [17 C.F.R. 275.204-2, 275.206(4)-2, and 275.206(4)-7].

3.      In addition, Morales aided and abetted Commonwealth's violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)], Rule 10b-5 thereunder [17 C.F.R. 240.10b-5], and Sections 206(1), 206(2), 206(4), and 207 of the Advisers Act [15 U.S.C. §§ 80b-4, 80b-6(1)-(4), and 80b-7] and Rules 206(4)-2, 206(4)-7, and 206(4)-8 [17 C.F.R. 275.204-2, 275.206(4)-2, 275.206(4)-7, 275.206(4)-8].

4.      Finally, at all times relevant to the charges contained in this Complaint, defendant Morales was a controlling person of Commonwealth pursuant to Section 20(a) of the Exchange Act [15 U.S.C. §78t(a)], and is therefore liable as a control person for Commonwealth's violations of the Exchange Act.

5.       The Commission requests, among other things, that this Court enjoin Defendants from committing further violations of the federal securities laws as alleged in this complaint, and order Defendants to pay disgorgement and a penalty based upon these violations.

## JURISDICTION AND VENUE

6.     The Commission brings this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209(d) of the Advisers Act [ 15 U.S.C. § 80b-9(d)] seeking among other things, to restrain and enjoin permanently the Defendants from engaging in the acts, practices, transactions, and courses of business alleged herein.  In addition to injunctive relief, the Commission seeks: (a) final judgments ordering Defendants to disgorge their ill-gotten gains, with prejudgment interest; (b) final judgments ordering the Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. 78u(d)], and Section 209(e) of the Advisors Act [15 U.S.C. § 80b-9(e)]; and (c) such equitable and other relief as the Court deems just, appropriate or necessary for the benefit of investors [15 U.S.C. § 78u(d)(5)].

7.     This Court has jurisdiction over this action, and venue lies in this District, pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)], Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa], Section 214 of the Advisers Act [15 U.S.C. §80b-14], and 28 U.S.C. §1345.  The Defendants, directly or indirectly, have used the mails and the means and instrumentalities of interstate commerce in connection with the acts, practices, transactions, and courses of business alleged herein, many of which occurred in this District.  In addition, the Defendants transacted business and maintained offices in this District throughout the relevant period.

## DEFENDANTS

8.     **Commonwealth Advisors, Inc.** is a Louisiana corporation with its headquarters in Baton Rouge, Louisiana.  At all relevant times it was engaged in the business of providing

3

investment advice to individual investors, separately managed accounts, hedge funds, other private funds, and a collateralized debt obligation.  Commonwealth has been registered with the Commission as an investment adviser since 1991.

9.      **Walter A. Morales**, age 50, resides in Baton Rouge, Louisiana.  At all relevant times Morales was a control person of Commonwealth and he is currently the firm's sole owner.  Prior to 2011, Morales and his wife each owned fifty percent of Commonwealth.  Morales was also the founder, president, chief investment officer and portfolio manager of Commonwealth.  He was responsible for overseeing Commonwealth's overall investment policies.  Commonwealth identified Morales as a control person of the firm in the Form ADV registration statements it filed with the Commission and has updated annually since at least 2005.  According to the private placement memoranda that Commonwealth distributed to some prospective investors in the funds it advised, the investment activities of both Commonwealth and the funds depend upon the expertise of Walter A. Morales.  In 2007, Commonwealth told prospective investors through due diligence questionnaire answers that Morales manages all fund operations and investment activities, oversees the firm's active management of balanced, fixed income, and distressed asset portfolios, and has extensive dealings with all service providers.  Commonwealth further stated in presentations to a prospective investor that Morales pre-approves all fund trades and serves on Commonwealth's best execution, pricing/valuation, and "soft dollar" committees.

## OTHER RELEVANT ENTITIES AND INDIVIDUALS

10.     **Sand Spring III** is a group of three hedge funds created in July and August 2007.  The funds operate in a master-feeder fund structure comprised of Sand Spring Capital III Master Fund, LLC, a Delaware limited liability company and two feeder funds, Sand Spring Capital III, LLC, a Delaware limited liability company, and Sand Spring Capital III, Ltd., a Cayman Islands

Company (collectively "Sand Spring III").  The two feeder funds invest substantially all of their assets in Sand Spring Capital III Master Fund, LLC.  Commonwealth served as investment adviser to the Sand Spring III Funds from at least August 2007 through April 25, 2012.  Sand Spring III filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware on October 25, 2011.

11.     **The Core Funds** are two hedge funds created in 2005.  The funds operate as parallel investment vehicles with similar investment objectives, strategies, and restrictions.  The Core Funds are CA Core Fixed Income Fund, LLC, a Delaware limited liability company, and CA Core Fixed Income Offshore Fund, Ltd, a Cayman Islands company (collectively "Core Funds").  Commonwealth served as investment adviser to the Core Funds from at least 2006 through April 25, 2012.  The Core Funds filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware on October 25, 2011.

12.     **The CA Funds** are two hedge funds created in 2005.  The funds operate as parallel investment vehicles with similar investment objectives, strategies, and restrictions.  The CA Funds are CA High Yield Fund, LLC, a Delaware limited liability company and CA High Yield Offshore Fund, Ltd, a Cayman Islands company (collectively "CA Funds").  Commonwealth served as investment adviser to the CA Funds from at least 2006 through April 25, 2012.  The CA Funds filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware on October 25, 2011.

13.     **The Large Investor** is an investment adviser to several large institutional clients including pension funds and hedge funds.  At all relevant times it had discretionary authority to make investment decisions for its clients. The Large Investor invested approximately $149

million of its clients' assets in Commonwealth managed funds between August 2007 and May 2008.

## FACTUAL BACKGROUND

14.     At all relevant times Commonwealth served as investment adviser to individual investors, institutional investors, and several hedge funds including the CA Funds and the Core Funds.  Starting in late 2005, Commonwealth began transferring many of its individual clients with separately managed accounts into Commonwealth-advised hedge funds.  In August 2007, Commonwealth assumed advisory responsibility for Sand Spring III, a newly created family of hedge funds.  The investors in all of these funds were pension funds, individuals, and institutional investors.

15.     In addition to serving as an investment adviser to individual investors and the hedge funds, Commonwealth became the collateral manager to a collateralized debt obligation ("CDO") known as Collybus I ("Collybus") on November 9, 2007.  Commonwealth participated in creating Collybus along with an investment bank ("Investment Bank") that contributed assets to the CDO and served as the lead structurer, placement agent, and arranger for Collybus. Defendants participated in forming Collybus, in part, by removing failing RMBS from certain Commonwealth funds and selling the impaired securities to Collybus to be included in the CDO portfolio.  Investors in Collybus purchased notes that paid a return so long as the assets that comprised the portfolio continued to perform.  The return on the Collybus notes was dependent upon the performance of the RMBS and other asset-backed securities that comprised the Collybus portfolio.

16.     Like other CDOs, Collybus was structured so that investors who owned notes with a higher credit rating and a higher priority of repayment received a lower interest rate.

Collybus' debt notes were issued in several classes (or "tranches") designated tranches A through E.  Each tranche had a different seniority in the priority of repayment and a different rate of return with the A tranche having the highest priority of repayment and lowest interest rate. The A tranche also was subdivided into A1, A2, and A3 tranches based on, among other criteria, priority of repayment. Collybus' residual or equity interests (the "Equity tranche" or "E tranche"), which were the last in priority of repayment, did not receive a fixed rate of return but instead were usually entitled to receive any assets or interest that may remain after the CDOs' obligations were satisfied and its notes repaid.

17.     To govern its conduct as the Collybus collateral manager, Commonwealth entered into an advisory agreement with Collybus known as a Collateral Management Agreement. Morales signed the agreement on behalf of Commonwealth on November 9, 2007.   The Collateral Management Agreement, among other things, addressed conflicts of interest that could arise from Commonwealth's role as an investment adviser to multiple clients.  Section 9 of the Collateral Management Agreement, titled "Conflicts of Interest of Collateral Manager," provided that Commonwealth could sell securities from funds that it managed to Collybus only if the sales were "made on a basis no less favorable, taken as a whole, than would be obtained in a similar transaction with an unaffiliated third party and were otherwise consistent with applicable law and the Collateral Management Agreement."   The Collateral Management Agreement further required Commonwealth to conduct the purchase and sale of all securities by Collybus "on arm's length terms in accordance with reasonable and customary business practices and in compliance with all applicable laws."

18.     As investment advisers, Commonwealth and Morales were fiduciaries to Collybus, the Core Funds, the CA Funds, and Sand Spring III.  In contravention of these duties,

Commonwealth and Morales, engaged in transactions that Defendants designed to hide losses from investors in the Core Funds, CA Funds, and Sand Spring III, including trading securities among Commonwealth clients to benefit some of those clients at the expense of others.   In furtherance of the scheme, Defendants also made material misrepresentations regarding Sand Spring III's exposure to risky Collybus notes, the procedures used to value those notes, and purported meetings of Commonwealth's valuation committee.

### THE DEFENDANTS' SCHEME

#### A.  The Sale of RMBS to Collybus

19.    By the beginning of 2007, Defendants had invested a significant portion of the CA Funds and the Core Funds' assets in RMBS.  In 2007, mortgage markets started to decline dramatically.  By July 2007, bond rating agencies began to aggressively downgrade subprime RMBS.  In addition, an increase in principal write-downs in the residential mortgage market meant that some RMBS would no longer be entitled to any payments of principal or interest.  Therefore, by the summer of 2007, Commonwealth clients were sustaining heavy investment losses and Morales knew those losses would probably continue.

20.    Rather than disclose the losses, Commonwealth and Morales engaged in a scheme to hide them from investors.  This scheme included removing declining RMBS from Commonwealth-advised accounts and funds, including the Core Funds and CA Funds, by selling the impaired securities to Collybus.  On November 9, 2007, Commonwealth and Morales caused Collybus to purchase RMBS from Commonwealth-advised funds using prices purportedly obtained from a pricing service and a broker-dealer for the period ending June 30, 2007.

21.    Commonwealth and Morales knew that the RMBS market declined precipitously between June 30, 2007 and November 9, 2007.  In early July 2007, Standard & Poor's Ratings

Services and Moody's Investors Service lowered their credit ratings on at least 498 classes of subprime RMBS, sending the prices of RMBS downward. Morales knew about these events when they occurred because they were widely publicized at the time.

22.     On August 13, 2007, Morales received an email from another Commonwealth employee listing RMBS owned by Commonwealth-advised funds and the prices at which Commonwealth would direct Collybus to buy those securities on November 9, 2007. The sale prices for many of the RMBS were the June 30, 2007 prices that Commonwealth previously obtained from a pricing service and broker-dealer. On August 15, 2007, only two days after receiving the email, Morales sent another email to the Investment Bank listing different marks for those RMBS purportedly from the same pricing service that provided the June 30, 2007 prices. These more current marks were substantially lower than the June 30, 2007 prices that Commonwealth used to sell the RMBS to Collybus on November 9, 2007.

### B. Misuse of $35 Million

23.     The Commonwealth Advisors. Inc. Investment Adviser Procedures and Compliance Manual ("Compliance Manual"), dated February 28, 2007, provided that, "Advisers with custody of client funds and securities must maintain them with qualified custodians. The qualified custodian must hold the funds or securities in an account either under the client's name or under the adviser's name as agent or trustee for its clients. Commonwealth maintains all client accounts' assets with qualified custodians (prime brokers) and they are held with such qualified custodians in the clients' names." At all relevant times, Commonwealth policy required all of the firm's personnel, including Morales, to certify on an annual basis that they have read and understand the procedures contained in the Compliance Manual.

24.     For the purpose of facilitating the closing of Collybus on November 9, 2007, Commonwealth used $35 million that belonged to Sand Spring III to purchase RMBS from other Commonwealth-advised funds and sell the securities to the CDO.

25.     In connection with this transaction, Commonwealth transferred $35 million from Sand Spring III's account at its prime broker into an account titled in Commonwealth's own name at a broker-dealer.  Thus, Commonwealth had custody of client funds but did not maintain those funds in a separate account in the client's name or in an account under Commonwealth's name as agent or trustee for that client.  Morales personally signed authorizations for at least $30 million of this transfer on October 24 and 26, 2007.  Commonwealth ultimately returned about $34.7 million of these funds to Sand Spring III but failed to repay the fund approximately $300,000.

C.  **Misrepresentations about Sand Spring III's Collybus Investment**

26.     On or about November 9, 2007,  Commonwealth-advised funds purchased most of the Collybus Equity tranche.

27.     The Large Investor in the Sand Spring III fund invested $129 million of its own clients' money in the fund between August and October 2007.  Before making any additional investment, the Large Investor's managing director explained to Morales that he did not want a large portion of Sand Spring III invested in any single asset, including a CDO.  This was particularly important to the Large Investor because, as an investment adviser, it wanted to decrease its clients' investment risk by making diversified investments on their behalf.  The Large Investor did not want to expose its clients to investment risks associated with a fund overly concentrated in a single asset.  Prior to the Collybus closing on November 9, 2007, Morales assured the Large Investor that Sand Spring III would invest only about $12 million in Collybus.

28.     Just a few days later, Morales directed Sand Spring III to invest approximately $49 million in the Equity tranche of Collybus.   By November 20, 2007, Sand Spring III's investment in Collybus constituted 35% of the fund's assets.

29.     The managing director immediately complained to Morales about the size of Sand Spring III's Collybus investment.   During a November 30, 2007, telephone call with the managing director, Morales acknowledged that the large size of the investment in Collybus was not consistent with their previous discussions about the need to diversify the fund and agreed to reduce Sand Spring III's Collybus investment to 10% or less of fund assets.

30.     On December 3, 2007, Morales confirmed their agreement by sending an email to the managing director stating that "The exposure of Sand Spring III to the Collybus CDO will be limited to 10% of the equity of the fund.  That limit will be applied to the exposure and not the capital commitment."

31.     Morales temporarily honored his promise to reduce Sand Spring III's exposure to Collybus by cross-trading a portion of the Equity tranche from Sand Spring III to two other Commonwealth-advised funds, Sand Spring, LLC and Sand Spring, Ltd. (collectively "Sand Spring I"), on or about December 21, 2007.  As a result, the year-end financial statement for Sand Spring III, showed that its exposure to Collybus was approximately eleven or twelve percent – at or near the ten percent exposure limit that Morales promised in December 2007.

32.     Commonwealth directed the cross-trades of the Collybus Equity tranche between Sand Spring III and Sand Spring I through a broker-dealer by providing the broker-dealer with both the buy and sell prices so that the trade order was never exposed to the market.  The broker executed the trades at the prices provided by Commonwealth without verifying whether those prices were market prices.  Commonwealth's Form ADV Part II, dated February 23, 2007, –

which was part of the firm's investment adviser registration with the Commission – stated that Commonwealth "does not execute cross trades with any CA Fund or Sand Spring Fund."  Even after making the cross-trades on or about December 21, 2007, Commonwealth continued to include the same representation prohibiting cross-trades in its Forms ADV Part II dated March 26, 2008 and July 2, 2008.

33.     Commonwealth's Compliance Manual in effect at the time also prohibited cross-trades between Commonwealth managed funds.  The Compliance Manual, dated February 28, 2007, specifically stated that, "there will be no cross trades between any Fund and any other client."  The Compliance Manual provided that all Commonwealth members, officers, and employees, including Morales, were subject to its provisions.  It also required Morales and all other Commonwealth personnel to certify, on an annual basis, that they have read and understand the procedures contained in the Compliance Manual.  Commonwealth provided the Compliance Manual to the Large Investor on June 27, 2007.

34.     The Large Investor understood that Defendants would adhere to the ten percent limit going forward and relied on Morales' representation when it decided to make additional investments in Sand Spring III, including investments of $1 million in February 2008, $4.35 million in March 2008, $1.6 million in April 2008, and $1 million in May 2008.  These new investments resulted in additional profit for Defendants because one of the ways Commonwealth received compensation from Sand Spring III investors was in the form of management fees which were determined as a percentage of fund assets.

35.     However, Defendants abided by their ten percent limit representation only for a short time.  Morales soon directed Commonwealth to dramatically increase Sand Spring III's investment in Collybus.  From February 28 through at least June 30, 2008, Sand Spring III's

investment in Collybus was between approximately 21 and 33 percent of the fund's assets.  Yet, throughout this entire period, Defendants never informed the Large Investor that they were no longer limiting Sand Spring III's exposure to the Collybus CDO to ten percent of the fund's assets.  Instead, Morales and Commonwealth repeatedly lied to the Large Investor about the size of Sand Spring III's exposure to Collybus so that the investor would believe they were still complying with the ten percent limit.

36.     For example, on May 9, 2008 Morales and another Commonwealth employee had a conference call with representatives of the Large Investor, including its managing director. During the call, Morales or the other Commonwealth employee told the Large Investor that only ten percent of Sand Spring III's portfolio was invested in collateralized debt obligations. Commonwealth's representation was false because at least 22 percent of the fund's portfolio was invested in the Collybus CDO on May 9, 2008.  Although it is not known which of the two Commonwealth representatives participating in the call made this false statement, neither of them corrected it.

37.     On June 11, 2008, Morales and a Commonwealth employee met with the Large Investor at its headquarters to discuss the status of Sand Spring III's portfolio.  During that meeting, Morales told the managing director and other employees of the Large Investor that as of June 9, 2008, only about 5.56% of Sand Spring III's assets were invested in Collybus.  Morales also gave a power point presentation to the Large Investor's employees that included a slide purporting to depict on a pie chart the various business sectors in which Sand Spring III invested. The chart indicated that on June 9, 2008, Sand Spring III's exposure to "CDO" investments was 5.56% of fund assets.  In fact, on June 9, 2008, the Collybus CDO investments accounted for at least 21% of Sand Spring III's portfolio.

**D.  False Statements about Valuation Methodology and Inflated Asset Values**

38.    On June 15, 2007, the Large Investor's director of operations and other employees met with Defendants to discuss a potential investment in Commonwealth managed funds.  At that meeting Defendants gave a power point presentation during which they showed the Large Investor a slide stating, that for all Commonwealth-advised funds, "portfolio holdings will be valued based on market quotations whenever market quotations which reflect current market activity are available. . . . Market quotations are provided by one or more dealers who make markets in the funds' holdings. . . . All financial instruments for which market quotations are not readily available will be valued at fair value as reasonable (*sic*) determined in good faith by the [funds'] administrator using an independent third-party pricing service."  Defendants also told the Large Investor that the funds' administrator independently verified the prices at month end for purposes of determining each fund's net asset value ("NAV").  Defendants further stated at the meeting that Commonwealth has a Pricing/Valuation Committee with the goal that "valuation of accounts is fair and reflects current market conditions."

39.    On August 18, 2007, Commonwealth sent the Large Investor a private placement memorandum ("PPM") for the Sand Spring III fund dated August 15, 2007.  The PPM contained the same representations about the pricing and valuation of fund assets that Defendants made in their June 15, 2007 presentation and reiterated that, "[a]ll financial instruments for which market quotations are not readily available will be valued at fair value as reasonable (*sic*) determined in good faith by the [a]dministrator in consultation with third-party pricing service."  The PPMs that Commonwealth provided to certain investors in its other funds contained virtually identical representations concerning the pricing and valuation of assets in those funds.

14

40.     In addition, starting in the fall of 2007, the Large Investor asked Commonwealth to answer due diligence questionnaires for Sand Spring III on a quarterly basis.  In its due diligence questionnaire answers dated October 3, 2007, January 9, 2008, and May 13, 2008, Commonwealth stated that Sand Spring III's administrator, and not Commonwealth, valued one hundred percent of the fund's portfolio at the end of each month.

41.     These representations were important to the Large Investor because they addressed a potential conflict of interest between the fund's investors and Commonwealth. Commonwealth received compensation for managing Sand Spring III through management fees that were calculated as a percentage of the fund's asset value.  Moreover, a higher NAV could help Commonwealth attract additional investors by making the fund appear more successful. Therefore, Commonwealth had a financial incentive to place a high value on all of the fund's assets including Collybus.  In addition, the Large Investor relied on the valuations it received for Sand Spring III when providing NAV statements to its own clients.  The Large Investor was particularly concerned about the value placed on Collybus tranches because there were no readily available market quotations for them.

42.     Unbeknownst to the Large Investor during spring 2008, at least 21% of Sand Spring III's assets were comprised of the Collybus.  Morales knew the Collybus tranches had been declining in value and, therefore, Sand Spring III would suffer losses.  In contravention of their representations to the Large Investor regarding the pricing of the fund's assets and to hide the Collybus losses in Sand Spring III, Morales and Commonwealth self-priced Collybus tranches in the funds they advised from at least March 2008 through May 2008.  Morales instructed a Commonwealth employee to simply price the tranches at or near par.  Par value

reflects the current face amount of the notes.  Prices for the Collybus tranches were usually expressed as a percentage of par value.

43.    In addition, the administrator did not independently price or independently verify pricing on any of the Commonwealth-advised funds' fixed income securities, including Collybus, for purposes of determining those funds' NAV.  Instead, the administrator determined the funds' NAV using prices provided by Commonwealth and distributed statements of the NAV to the funds' investors pursuant to a services agreement it had with the funds.  The recipients of these NAV statements included the Large Investor and other Sand Spring III investors.

44.    From at least March 2008 through at least May 2008, Defendants priced Collybus investments in the funds they advised, including the E tranche in Sand Spring III, at, near, or above par value even though Morales had access to information showing those investments were actually worth far less.  Because Commonwealth was the Collateral Manager for Collybus, Morales received monthly reports from the Collybus Trustee.  These reports showed the poor and steadily declining performance of the collateral underlying Collybus.  For example, the March 31, 2008 Collybus Trustee Report, which Morales received by at least April 10, 2008, stated that the Collybus D tranche failed a collateral coverage test – meaning that the CDO no longer had sufficient collateral to fully repay investors in the D tranche.  This result necessarily meant that it was highly unlikely investors in the lower rated equity tranche would receive any return on their investment.  Morales also knew by June 5, 2008 when he received the May 31, 2007 Trustee Report that the Collybus C tranche had failed a collateral test also.

45.    In addition, the Investment Bank offered to sell Commonwealth-advised funds some of the A2 and A3 tranche notes at prices well below their par value.  Ordinarily the A tranche, which is significantly higher in priority of payment than the C, D, and Equity tranches,

would be worth more than the lower rated tranches.  On December 3, 2007, an employee of the Investment Bank emailed Morales offering to sell Collybus A3 tranche notes for 85 – meaning 85% of par value.  The same Investment Bank employee emailed Morales on March 6, 2008, asking if Commonwealth-advised funds would bid in the 80s for Collybus A2 tranche notes.  Morales responded on the same day stating, "No we would be in the 70's, and perhaps lower than 75."  Just a few days later, on March 13, 2008, Morales emailed the Investment Bank employee and told him that, "The probably (sic) is that if you mark . . . [the A2 tranche] today it would be 40."  On April 10, 2008 the Investment Bank again emailed Morales and offered the A2 tranche to Commonwealth managed funds, but this time at 78.  Finally, on June 4, 2008, Commonwealth, on behalf of funds it advised, bought A2 tranche notes from the Investment Bank for 72.75 – well below their par value of 100.  These communications in which the Investment Bank repeatedly offered to sell higher rated tranches of Collybus at well below par provided Morales with further notice that the E tranche was not worth anywhere near par.  Yet, at the same time Morales was engaged in these communications with the Investment Bank, Defendants continued to mark Collybus tranches owned by Commonwealth-advised funds, including the E tranche owned by Sand Spring III, at, near, or above par.  The total par value of the Collybus E tranche owned by Sand Spring III during the March through May 2008 time period was approximately $33 million.

**E. The Large Investor Learns Commonwealth is not Following its Stated Valuation Policy and Morales Creates Fictitious Valuation Committee Meeting Minutes**

46.     In late June 2008, an independent due diligence firm provided the Large Investor with a report indicating that Commonwealth was not following its valuation procedures for the funds because Sand Spring III's administrator was not independently obtaining or verifying asset prices.  A prospective investor in Sand Spring III had retained the due diligence firm to conduct a

review of Commonwealth and Sand Spring III.  During that review in May 2008, Morales told a representative of the due diligence firm that he was unsure whether Sand Spring III's administrator independently receives and verifies prices for every single fund asset but that the administrator should be doing so.  Representatives of the administrator subsequently told the due diligence firm that it did not receive prices independently and that it uses quotes supplied by Commonwealth to calculate the fund's NAV without checking any of the prices.  The due diligence firm described this discrepancy over Sand Spring III's pricing procedure in a May 21, 2008 Report that it distributed to its customers, including the Large Investor, through a subscription service.

47.     After receiving the report from the due diligence firm, the Large Investor complained to Commonwealth about the lack of price verification by the administrator and immediately halted all further investments in Sand Spring III, including stopping an investment it planned to make on July 1, 2008.

48.     On July 8, 2008, The Large Investor visited Commonwealth to conduct an operational due diligence review of the firm.  During that visit, Morales admitted to the Large Investor's representative that he incorrectly told the due diligence firm that Sand Spring III's administrator was receiving prices independently for the funds' assets.  Morales claimed to be unaware that the administrator was not obtaining prices independently.  He also asserted to the Large Investor that the administrator should have been receiving prices independently based on Sand Spring III's formal valuation policy and its agreement with the administrator.

49.     Morales knew or was reckless in not knowing that his statements to the due diligence firm and the Large Investor were false when he made them.  An employee of the administrator told Morales by at least April 1, 2008, that it does not independently verify the

18

prices Commonwealth gives it for fixed income products.   This statement from the administrator's employee was particularly significant because the majority of Sand Spring III's portfolio, including Collybus, was fixed income products.   In addition, contrary to Morales' representation to the Large Investor, the services agreement between Sand Spring III and the administrator did not state that the administrator should independently obtain or verify prices for fund assets.   Instead, it stated that the administrator "shall obtain [fund] portfolio pricing at the end of each month . . . "  Thus, the agreement did not prohibit the administrator from receiving pricing directly from Commonwealth rather than independent sources.   Moreover, the agreement did not state that the administrator must verify or otherwise check any of those prices.   Morales was aware of the terms of the agreement because he signed it on behalf of Sand Spring III on or about October 15, 2007.

50.    As part of its preparation for the July 8, 2008 visit, the Large Investor sent Commonwealth a due diligence questionnaire that asked, among other things, whether Commonwealth had a valuation committee and, if so, whether the committee maintained minutes of its meetings.   Commonwealth answered the questionnaire by stating that it had a valuation committee that met bi-annually and kept minutes of its meetings.   This statement was false because Commonwealth did not have a functioning valuation committee and therefore, no valuation committee meetings had occurred.

51.    On July 8, 2008, the Large Investor asked Morales for copies of the valuation committee minutes.   Rather than admit that no valuation committee minutes existed because there had not been any valuation committee meetings, Morales prepared false minutes purporting to describe valuation committee meetings in January and April 2008.   Morales provided the minutes to Commonwealth employees and directed the employees to send the minutes to the

Large Investor.  The Large Investor received from Commonwealth the minutes falsely describing a valuation committee meeting in April 2008 that never actually occurred.

### F.  **The Manipulative Cross-Trades**

52.     Throughout the spring of 2008, Defendants priced the equity tranche of Collybus in Sand Spring III's portfolio at between 100% and 102% of par value even though the market continued to decline precipitously.  However, by April 2008, Morales knew based on reports from the Collybus Trustee and other market information that the equity tranche was declining rapidly and would soon be worthless.

53.     No longer able to hide the Sand Spring III losses from Collybus by simply self-pricing the tranches, Morales designed a scheme to conceal the losses by arranging for Sand Spring III to purchase securities from the CA Funds and the Core Funds at prices below Commonwealth's own valuation for the securities and then mark them back up to their market value after they were purchased by Sand Spring III.  Morales planned to disguise the resulting losses in the CA Funds and the Core Funds by directing those funds to purchase Collybus A2 tranche notes and then marking those notes at a value well above their purchase price.  Morales explained his scheme to one employee by saying, "I want to blow a hole in the Core Funds and patch it with A2."

54.     In April 2008, Morales implemented his scheme by instructing Commonwealth employees to prepare a series of manipulative cross-trades that would conceal a $32 million loss in the value of Sand Spring III's investment in the Collybus equity tranche.  Morales told his employees to plan the trades "as if Collybus was written down to zero."  On Morales' orders, two Commonwealth employees prepared spreadsheets outlining his plan to sell securities owned by the CA Funds and the Core Funds to Sand Spring III at a cumulative discount of $32 million

20

below Commonwealth's own valuation for those securities.   The spreadsheets listed the securities to be traded, the amount Commonwealth believed to be the market value of each security, the artificially low price at which the security would be sold to Sand Spring III, and the expected gain to Sand Spring III when the securities were marked back up to market value. Morales reviewed and approved the spreadsheets.

55.     On June 4, 2008, Morales entered into an agreement with the Investment Bank to buy the A2 Collybus tranche notes that he would use to "patch" the Core Funds and CA Funds. Later in June 2008, at Morales' direction, Commonwealth employees executed the planned cross-trades by selling at least 150 bonds from the CA Funds and Core Funds to Sand Spring III at prices well below the amount that Commonwealth believed to be the market value for those bonds.   After the bonds were transferred to Sand Spring III, Morales caused another Commonwealth employee to mark the securities at their fair market value as of June 30, 2008, which created a fraudulent gain of approximately $19 million for Sand Spring III at the expense of the CA Funds and the Core Funds.   The fraudulent gain was less than the $32 million Morales desired because the market declined between the time the securities were cross-traded and their June 30, 2008 valuation date.

56.     Commonwealth directed the cross-trades between Sand Spring III and the other funds it advised by providing the broker-dealer with both the buy and sell prices so that the trade order was never exposed to the market.   The broker-dealer executed the trades at the prices provided by Commonwealth without verifying whether those prices were supported by market prices.

57.     Morales ordered Commonwealth's employees to execute the cross-trades even though Commonwealth's Form ADV Part II, dated March 26, 2008, stated that Commonwealth

"does not execute cross trades with any CA Fund or Sand Spring Fund."  On July 2, 2008, less than one month after the cross-trades were completed, Commonwealth filed an updated ADV Part II containing the same representation that it "does not execute cross-trades with any CA Fund or Sand Spring Fund."  Commonwealth's February 28, 2007 Compliance Manual similarly prohibited cross-trades between "any Fund and any other client."  Shortly after completing the June 2008 cross-trades, Commonwealth prepared a revised Compliance Manual, dated July 8, 2008, that again stated, "there will be no cross trades between any Fund and any other client."  Commonwealth provided the revised Compliance Manual to the Large Investor on July 11, 2008.

58.    A Commonwealth employee sent many of the trade orders for the cross-trades to a broker-dealer for execution using her personal email account.  Accordingly, for many of these orders Commonwealth did not make, keep, or maintain on its premises any memoranda identifying the person who recommended the transactions to the firm's clients and the person who placed the orders.

59.    The cross-trades aroused considerable concern at the administrator for Sand Spring III and the Core Funds.  On June 18, 2008 one of the administrator's employees warned Commonwealth about mounting losses to the Core Funds caused by the trades.  On the same day, the administrator sent a chart to Morales' assistant listing eighteen bonds sold from the Core Funds to Sand Spring III on June 11 and 12, 2008.  For each bond, the chart reflected the original cost, Commonwealth's May 31, 2008 valuation, the June 11-12 sale price of the bond, and the resulting loss.  For example, the chart reflected that on June 11, 2008, Commonwealth sold Core Fund bonds to Sand Spring III at $34.75 per bond even though Commonwealth valued those same bonds at $88.50 as recently as May 31, 2008.  This transaction alone resulted in a $3.4

million loss to the Core Funds.  The administrator also warned Commonwealth that all the transactions reflected on the chart resulted in a total net loss to the Core Funds of $27 million.

60.    Morales' assistant forwarded the administrator's email with the attached chart to Morales and others at Commonwealth on June 18, 2008.  Within hours of receiving and reviewing the materials, Morales told his assistant, "That is what we are expecting."  Morales' assistant relayed his response to the administrator later that same day.

61.    The cross-trades also concerned Sand Spring III's prime broker which was also the fund's custodian.  In mid-June 2008, the prime broker told Commonwealth that they would not process the cross-trades unless the parties executed a letter certifying that, among other things, the trades were made for legitimate business purposes and at prevailing market prices using a commercially reasonable valuation methodology, and that the transfers did not breach any duty owed to any client.  On or about June 17, 2008, Morales signed a letter to the prime broker, on behalf of Sand Spring III, certifying, among other things that:

- Each Transfer is, and will be, made for a legitimate business purpose and in furtherance of our business; and

- The Transfers will be valued by us at prevailing market prices using a methodology that is commercially reasonable under the circumstances and consistent with our applicable contractual or other legal obligations and the methodology that is ordinarily used by us to value such assets, do not breach any duty owed to us or our investors and are suitable for us and in our best interests and the best interests of our investors.

62.    Another Commonwealth officer signed a similar letter on behalf of the CA Funds, the Core Funds, and Commonwealth.  The representations in both letters were false because, for the reasons stated above, the cross-trades were not made for a legitimate business purpose, were not executed at prevailing market prices using a commercially reasonable valuation

methodology, and breached duties owed to Commonwealth clients.  After receiving Morales'
certification, the prime broker allowed the cross-trades to continue.

63.     Between July 2008 and August 2008, investors in the CA Funds and Core Funds
redeemed over $2.5 million of their investment in those funds at artificially low values caused by
the cross-trades.

64.     In addition, on July 23, 2008 Morales sent to the Large Investor a profit and loss
statement for the Sand Spring III Funds for the June 1 through June 30, 2008 period.  This
statement was misleading because it disguised part of the loss on the Funds' Collybus investment
by including fraudulent gains from the June cross-trades.

65.     Shortly before directing his employees to execute the June 2008 cross-trades,
Morales agreed with the Investment Bank that Commonwealth-advised funds would purchase
Collybus A2 notes at 72.75.   Morales subsequently provided misleading information to a
valuation firm that priced those A2 notes at 88.  In this manner, Morales "patch[ed]" the hole he
had blown in the Core Funds and CA Funds with the manipulative June 2008 cross-trades.

**G.  Defendants Hire a Valuation Firm and Provide it False Information**

66.     After the Large Investor complained to Commonwealth that Sand Spring III's
administrator was not independently verifying the prices of fund assets in contravention of
Defendants' representations, Morales retained a valuation firm in late June 2008 to value
Collybus tranches owned by Commonwealth-advised funds.  Because part of Morales' cross-
trading scheme was to purchase Collybus A2 tranche notes for the CA Funds and the Core Funds
at a price of 72.75 and then mark the notes up in value to hide the losses those funds incurred
from the June cross-trades, he needed the valuation firm to determine a price for the A2 tranche
notes that was considerably above their 72.75 purchase price.  Accordingly, Morales falsely told

the valuation firm that the funds had purchased the A2 tranche notes in late 2007 or early 2008 as part of a package deal, implying that the Commonwealth-advised funds overpaid for the Collybus C, D, and Equity tranches and in return received a discount on some of the A2 tranche notes when they purchased them at 72.75.   In reality, the Core Funds and the CA Funds purchased the A2 tranche notes from the Investment Bank less than a month earlier – in June 2008 – but neither as part of a package that included notes of other Collybus tranches, nor at a discount.

67.     The valuation firm then priced the A2 tranche notes at 88, which represented an immediate gain of approximately $80 million from the 72.75 price that the Commonwealth-advised funds had recently paid in June 2008.  Morales allocated this $80 million gain to conceal the losses generated in the Core Funds and CA Funds by the June cross-trades.

68.     On or about July 17, 2008, the valuation firm issued the following prices for Collybus tranches: 88 for the A2 tranche, 35 for the C tranche, 20 for the D tranche, and 0 for the Equity tranche.  Shortly after the valuation firm determined these prices, Morales called the Large Investor's managing director and told him that Sand Spring III was going to lose fifteen percent of its value due to a write-down in the value of Collybus.  The managing director asked how Sand Spring III could incur a fifteen percent loss because of a "write-down" in the value of Collybus when Sand Spring III's exposure was only approximately five percent of the fund's assets.  Morales responded that the decline resulted from a complete loss in value of the Equity tranche from par value to zero.  Morales knew that the Large Investor would likely terminate its relationship with Commonwealth as a result of this news. In fact, during the call Morales acknowledged, "We [Commonwealth] are probably fired."

69.     By at least the time of his phone call with the managing director in late July 2008, Morales knew that the Large Investor would likely redeem its investment in Sand Spring III – which unbeknownst to the Large Investor – was inflated as a result of the manipulative cross-trades in June 2008.   Moreover, in August 2008, the Large Investor obtained monthly asset holding reports for Sand Spring III directly from the fund's administrator.   These reports reflected that Sand Spring III's exposure to Collybus from late February through at least June 2008, was well above the ten percent limit and far higher than the 5.56% exposure that Morales had represented to the Large Investor on June 11, 2008.

70.     On or about the week of September 1, 2008, Morales directed Sand Spring III's administrator to reverse the cross-trades that he ordered in June 2008.   This resulted in an additional decline in Sand Spring III's NAV.   A few weeks later, on or about September 24, 2008, the Large Investor requested a complete redemption of its Sand Spring III investments.

## FIRST CLAIM

### Violations of Section 17(a)(1) and 17(a)(3) of the Securities Act

71.     The Commission repeats and realleges Paragraphs 1 through 70 of the Complaint as if fully set forth herein.

72.     As alleged herein, Defendants Commonwealth and Morales directly or indirectly, singly or in concert with others, in the offer and sale of securities, by the use of the means and instruments of transportation and communication in interstate commerce and of the mails, knowingly or recklessly: (a) employed devices, schemes or artifices to defraud; and/or (b) engaged in transactions, practices or courses of business which operated or operate as a fraud or deceit upon purchasers of securities.

26

73.     By reason of the foregoing, Defendants Commonwealth and Morales violated, and unless enjoined and restrained will continue to violate, Section 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §77q(a)].

## SECOND CLAIM

### Violations of and Aiding and Abetting Violations
### of Section 10(b) of the Exchange Act and Rule 10b-5

74.     The Commission repeats and realleges Paragraphs 1 through 73 of the Complaint as if fully set forth herein.

75.     As alleged herein, Defendants Commonwealth and Morales directly or indirectly, singly or in concert, by the use of the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated and operate as a fraud or deceit upon purchasers of securities and upon other persons.

76.     By reason of the foregoing, Defendants Commonwealth and Morales violated, and unless enjoined and restrained will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

77.     As further alleged herein, Defendant Morales knowingly provided substantial assistance to Commonwealth's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendant Morales aided and abetted, and unless enjoined and restrained will continue to aid and abet,

violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## THIRD CLAIM

### Violations of and Aiding and Abetting Violations
### of Sections 206(1) and 206(2) of the Advisers Act

78.     The Commission repeats and realleges Paragraphs 1 through 77 of the Complaint as if fully set forth herein.

79.     At all relevant times, Defendants Commonwealth and Morales operated as investment advisers as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)], and served in that capacity with respect to their clients and investors.

80.     As alleged herein, Defendants Commonwealth and Morales, while acting as investment advisers, directly or indirectly, by use of the mails or means and instrumentalities of interstate commerce: (a) with requisite scienter, employed devices, scheme, and artifices to defraud clients; and (b) engaged in transactions, practices, and courses of business which operated and operate as a fraud or deceit upon clients and prospective clients.

81.     By reason of the foregoing, Defendants Commonwealth and Morales violated, and unless enjoined will continue to violate, Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§80b-6(1)-(2)].

82.     As further alleged herein, Defendant Morales knowingly provided substantial assistance to Commonwealth's violations of Sections 206(1) and 206(2) of the Advisers Act.  By reason of the foregoing, Defendant Morales aided and abetted, and unless enjoined and restrained will continue to aid and abet, violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§80b-6(1)-(2)].

## FOURTH CLAIM

### Violations of and Aiding and Abetting Violations
### of Section 206(4) of the Advisers Act and Rule 206(4)-8

83.     The Commission repeats and realleges Paragraphs 1 through 82 of the Complaint as if fully set forth herein.

84.     At all relevant times, Defendants Commonwealth and Morales operated as investment advisers as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)], and served in that capacity with respect to their clients and investors.

85.     As alleged herein, Defendants Commonwealth and Morales, while acting as investment advisers to pooled investment vehicles, have made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to investors or prospective investors, or otherwise engaged in acts, practices, or courses of business that are fraudulent, deceptive, or manipulative with respect to investors or prospective investors.

86.     By reason of the foregoing, Defendants Commonwealth and Morales violated, and unless enjoined and restrained will continue to violate, Section 206(4) of the Advisers Act [15 U.S.C. §§80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8].

87.     As further alleged herein, Defendant Morales knowingly provided substantial assistance to Commonwealth's violations of Sections 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.  By reason of the foregoing, Defendant Morales aided and abetted, and unless enjoined and restrained will continue to aid and abet, violations of Section 206(4) of the Advisers Act [15 U.S.C. §§80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8].

## FIFTH CLAIM

### Violations of and Aiding and Abetting Violations
### of Section 206(4) of the Advisers Act and Rule 206(4)-2

88.    The Commission repeats and realleges Paragraphs 1 through 87 of the Complaint as if fully set forth herein.

89.    At all relevant times, Defendant Commonwealth operated as an investment adviser as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)], and served in that capacity with respect to its clients and investors.

90.    As alleged herein, Defendant Commonwealth while acting as an investment adviser had custody of client funds but did not maintain those funds with a qualified custodian (a) in a separate account for each client under that client's name or (b) in accounts that contain only the client's funds and securities under the name of Commonwealth as agent or trustee for the clients.

91.    By reason of the foregoing, Defendant Commonwealth violated, and unless enjoined and restrained will continue to violate, Section 206(4) of the Advisers Act [15 U.S.C. §§80b-6(4)] and Rule 206(4)-2 thereunder [17 C.F.R. 275.206(4)-2].

92.    As further alleged herein, Defendant Morales knowingly provided substantial assistance to Commonwealth's violations of Sections 206(4) of the Advisers Act and Rule 206(4)-2 thereunder.  By reason of the foregoing, Defendant Morales aided and abetted, and unless enjoined and restrained will continue to aid and abet, violations of Section 206(4) of the Advisers Act [15 U.S.C. §§80b-6(4)] and Rule 206(4)-2 thereunder [17 C.F.R. 275.206(4)-2].

## SIXTH CLAIM

### Violations of Section 204 of the Advisers Act and Rule 204-2

93.     The Commission repeats and realleges Paragraphs 1 through 92 of the Complaint as if fully set forth herein.

94.     At all relevant times, Defendant Commonwealth operated as an investment adviser as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)], and served in that capacity with respect to its clients and investors.

95.     Defendant Commonwealth made use of the mails and means and instrumentalities of interstate commerce in connection with its business as an investment adviser and was required to make and keep certain prescribed records as necessary or appropriate in the public interest and for the protection of investors.   Such records were subject at any time to such reasonable periodic, special, or other examinations by representatives of the Commission as the Commission deemed necessary or appropriate.

96.     As alleged herein, Defendant Commonwealth failed to make, keep, maintain on its premises and provide to the Commission all required records, including but not limited to, memoranda of all trade orders for the purchase or sale of securities showing the terms and conditions of the order, the person who recommended the transaction to the client and who placed the order.

97.     By reason of the foregoing, Defendant Commonwealth violated, and unless enjoined and restrained will continue to violate, Section 204 of the Advisers Act [15 U.S.C. §§80b-4] and Rule 204-2 thereunder [17 C.F.R. 275.204-2].

98.     As further alleged herein, Defendant Morales knowingly provided substantial assistance to Commonwealth's violations of Sections 204 of the Advisers Act and Rule 204-2

thereunder.  By reason of the foregoing, Defendant Morales aided and abetted, and unless enjoined and restrained will continue to aid and abet, violations of Section 204 of the Advisers Act [15 U.S.C. §§80b-4] and Rule 204-2 thereunder [17 C.F.R. 275.204-2].

### SEVENTH CLAIM

**Violations of and Aiding and Abetting Violations
of Section 206(4) of the Advisers Act and Rule 206(4)-7**

99.     The Commission repeats and realleges Paragraphs 1 through 98 of the Complaint as if fully set forth herein.

100.    At all relevant times, Defendant Commonwealth operated as an investment adviser as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)], and served in that capacity with respect to its clients and investors.

101.    As alleged herein, Defendant Commonwealth failed to implement written policies and procedures reasonably designed to prevent violation by Commonwealth and its supervised persons of the Advisers Act and rules thereunder.

102.    By reason of the foregoing, Defendant Commonwealth violated, and unless enjoined and restrained will continue to violate, Section 206(4) of the Advisers Act [15 U.S.C. §§80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R. 275.206(4)-7].

103.    As further alleged herein, Defendant Morales knowingly provided substantial assistance to Commonwealth's violations of Sections 206(4) of the Advisers Act and Rule 206(4)-7 thereunder.  By reason of the foregoing, Defendant Morales aided and abetted, and unless enjoined and restrained will continue to aid and abet, violations of Section 206(4) of the Advisers Act [15 U.S.C. §§80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R. 275.206(4)-7].

## EIGHTH CLAIM

### Violations of and Aiding and Abetting Violations
### of Section 207 of the Advisers Act

104.    The Commission repeats and realleges Paragraphs 1 through 103 of the Complaint as if fully set forth herein.

105.    At all relevant times, Defendant Commonwealth operated as an investment adviser as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)], and served in that capacity with respect to its clients and investors.

106.    Section 207 of the Advisers Act makes it unlawful for any person to make any untrue statement of material fact in any registration application or report filed with the Commission, or to willfully omit to state in any such application or report any material fact required to be stated therein.

107.    Commonwealth's Forms ADV Part II filed on March 26 and July 2, 2008 were false because they stated that "Commonwealth Advisors does not execute cross trades with any CA Fund or . . . [Sand Spring I Fund]."

108.    By reason of the foregoing, Defendant Commonwealth violated, and unless enjoined and restrained will continue to violate, Section 207 of the Advisers Act [15 U.S.C. §§80b-7].

109.    As further alleged herein, Defendant Morales knowingly provided substantial assistance to Commonwealth's violations of Sections 207 of the Advisers Act.  By reason of the foregoing, Defendant Morales aided and abetted, and unless enjoined and restrained will continue to aid and abet, violations of Section 207 of the Advisers Act [15 U.S.C. §§80b-7].

## NINTH CLAIM

### Control Person Liability Under Section 20(a) of the Exchange Act

110.    The Commission repeats and realleges Paragraphs 1 through 109 of the Complaint as if fully set forth herein.

111.    At all relevant times, Defendant Morales possessed, directly or indirectly, the power to direct and control Commonwealth's management, policies, and operations and was a control person of Commonwealth pursuant to 20(a) of the Exchange Act [15 U.S.C. §78t(a)]. Defendants Morales was a culpable participant in Commonwealth's violations of the Exchange Act as described above.

112.    By reason of the foregoing, Defendant Morales is jointly and severally liable as a control person of Commonwealth with, and to the same extent as Commonwealth for Commonwealth's violations of section 10(b) [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5], and unless enjoined and restrained Morales will continue to cause, or will fail to prevent, Commonwealth's violations of these provisions.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

(a)    Permanently restrain and enjoin defendants Commonwealth and Morales from violating or aiding and abetting violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)], Sections 206(1), 206(2), 206(4), and 207 of the Advisers Act [15 U.S.C. §§ 80b-6(1),(2) and (4), and 80b-7] and Rules 206(4)-2, 206(4)-7, and 206(4)-8 thereunder [17 C.F.R. 275.275.206(4)-2, 275.206(4)-7, and 275.206(4)-8], and as to Commonwealth only Section 204 of the Advisers Act and Rule 204-2 thereunder.

(b)     Order Commonwealth and Morales to pay disgorgement, together with prejudgment interest;

(c)     Order Commonwealth and Morales to pay penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and Section 209(e)(1) of the Advisers Act [15 U.S.C. § 80b-9(e)].

(d)     Grant such other relief as this Court may deem necessary and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and LR 38.1M, the Commission demands trial by jury in this action of all issues so triable under the claims in this Complaint.

Dated: November 8, 2011
          Washington, DC

Respectfully submitted,

DONALD J.CAZAYOUX, JR.
UNITED STATES ATTORNEY

/s/ John J. Gaupp
John J. Gaupp, LBN 14976
Assistant United States Attorney
777 Florida Street, Suite 208
Baton Rouge, Louisiana 70801
Telephone: (225) 389-0443
Fax: (225) 389-0685
E-mail: john.gaupp@usdoj.gov

  /s/Matthew A. Rossi
Matthew A. Rossi
SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, DC 20549-5971
Tel:  202-551-4039
Fax: 202-772-9231
Email:  RossiM@sec.gov
Counsel for Plaintiff

Of Counsel:
Gary Zinkgraf

35