## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,** | Civil Action No. 12-cv-700-JWD-SCR |
| **Plaintiff,** | **(Jury Trial Demanded)** |
| **v.** | |
| **COMMONWEALTH ADVISORS, INC.** **and WALTER A. MORALES,** | |
| **Defendants.** | |

## PLAINTIFF U.S. SECURITIES AND EXCHANGE COMMISSION'S
## STATEMENT OF UNDISPUTED FACTS
## IN SUPPORT OF PARTIAL SUMMARY JUDGMENT

Cheryl L. Crumpton
Stephan J. Schlegelmilch
Jonathan P. Hooks
Gary M. Zinkgraf
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, DC 20549
Telephone: (202) 551-4459 (Crumpton)
E-mail: CrumptonC@SEC.gov

John J. Gaupp, LBN 14976 (as local counsel)
UNITED STATES ATTORNEY'S OFFICE
777 Florida Street, Suite 208
Baton Rouge, LA 70801
Telephone: (225) 389-0443
Email: john.gaupp@usdoj.gov

September 15, 2016

Plaintiff U.S. Securities and Exchange Commission (the "SEC"), submits this Statement of Undisputed Facts in support of its Motion for Partial Summary Judgment against Defendants Commonwealth Advisors, Inc. ("Commonwealth") and Walter A. Morales ("Morales") (collectively, "Defendants").

## Jurisdiction and Venue

1.      This Court has jurisdiction over this action, and venue lies in this District, pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)], Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa], Section 214 of the Advisers Act [15 U.S.C. §80b-14], and 28 U.S.C. §1345.[1]  Defendants, directly or indirectly, have used the mails and the means and instrumentalities of interstate commerce in connection with the acts, practices, transactions, and courses of business alleged herein, many of which occurred in this District.[2]  In addition, the Defendants transacted business and maintained offices in this District throughout the relevant period.[3]

## Defendants

2.      Commonwealth is a Louisiana corporation with its headquarters in Baton Rouge, Louisiana.  At all relevant times it was engaged in the business of providing investment advice to individual investors, separately managed accounts, hedge funds, other private funds, and a collateralized debt obligation ("CDO").[4]  Commonwealth has been registered with the SEC as an investment adviser since 1991.[5]

---

[1]      Ex. 1, Answer of Defendants Commonwealth Advisors, Inc. and Walter A. Morales (Dkt. No. 13) ("Answer"), at ¶ 7; *see also* Ex. 2., Complaint (Dkt. No. 1), at ¶ 7.

[2]      *See, infra,* emails cited at paragraphs 28, 35, 63, 79, and 88.

[3]      Ex. 1, Answer at ¶ 8; Ex. 2, Complaint at ¶ 8.

[4]      *Id*.; *see also* Ex. 1, Answer at ¶ 14; Ex. 2, Complaint at ¶ 14.

[5]      Ex. 1, Answer at ¶ 8; Ex. 2, Complaint at ¶ 8.

3.      Morales, age 50, resides in Baton Rouge, Louisiana.[6]  At all relevant times Morales was a control person of Commonwealth, and he is currently the firm's sole owner.[7]  Prior to 2011, Morales and his wife each owned fifty percent of Commonwealth.[8]  Morales was also the founder, president, chief investment officer and portfolio manager of Commonwealth.[9]  He was responsible for overseeing Commonwealth's overall investment policies.[10]  Commonwealth identified Morales as a control person of the firm in the Form ADV registration statements it filed with the SEC and has updated annually since at least 2005.[11]  According to the private placement memoranda that Commonwealth distributed to some prospective investors in the funds it advised, the investment activities of both Commonwealth and the funds depend upon the expertise of Morales.[12]  In 2007, Commonwealth told prospective investors through due diligence questionnaire answers that Morales managed all fund operations and investment activities, oversaw the firm's active management of balanced, fixed income, and distressed asset portfolios, and had extensive dealings with all service providers.[13]  Commonwealth further stated in presentations to a prospective investor that Morales served on Commonwealth's best execution, pricing/valuation, and "soft dollar" committees.[14]  Only Morales "could execute a trade [on Commonwealth's clients' behalf] without authority from other

---

[6]      Ex. 1, Answer at ¶ 9; Ex. 2, Complaint at ¶ 9.

[7]      *Id.*

[8]      *Id.*

[9]      *Id.*

[10]     *Id.*

[11]     *Id.*

[12]     *Id.*

[13]     *Id.*

[14]     *Id.*

people."[15]  Morales was "the person who made the decision to hire Spectrum," Commonwealth's fund administrator.[16]  Morales had the authority to contractually bind Commonwealth, to make representations to Commonwealth's clients, and he had authority to purchase securities on behalf of Commonwealth's clients, including the purchase of the Equity tranche of Collybus, discussed further below.[17]

4.      At all relevant times, Commonwealth and Morales operated as investment advisers as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)], and served in that capacity with respect to their hundreds of individual and institutional clients and investors.[18]

5.      Commonwealth and Morales also admit that "they were fiduciaries to the Core Funds, the CA Funds and Sand Spring III, and that after November 9, 2007, Commonwealth was a fiduciary to Collybus."[19]

### The Commonwealth-Managed Funds

6.      Sand Spring III is a group of three hedge funds created in July and August 2007.[20] The funds operate in a master-feeder fund structure comprised of Sand Spring Capital III Master Fund, LLC, a Delaware limited liability company, and two feeder funds, Sand Spring Capital III, LLC, a Delaware limited liability company, and Sand Spring Capital III, Ltd., a Cayman Islands

---

[15]      Ex. 3, August 26, 2009 Investigative Testimony of Walter Morales ("Morales Aug. 26, 2009 Inv. Test."), at 14-15.

[16]      *Id.* at 48.

[17]      *See, e.g.*, Ex. 4, CAN 834-60, Commonwealth Note Purchase Agreement; Ex. 5, CII-SEC0000592-607, August 15, 2007 letter from Defendants to Crestline.

[18]      Ex. 1, Answer at ¶ 14, 84; Ex. 2, Complaint at ¶ 14, 84.

[19]      Ex. 1, Answer, at ¶ 18; Ex. 2, Complaint at ¶ 18.

[20]      Ex. 1, Answer at ¶ 10; Ex. 2, Complaint at ¶ 10.

Company (collectively "Sand Spring III").[21]  The two feeder funds invested substantially all of their assets in Sand Spring Capital III Master Fund, LLC.[22]  Commonwealth served as investment adviser to the Sand Spring III Funds from at least August 2007 through April 25, 2012.[23]  Sand Spring III filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware on October 25, 2011.[24]

   7.    The Core Funds are two hedge funds created in 2005.[25]  The funds operate as parallel investment vehicles with similar investment objectives, strategies, and restrictions.[26]  The Core Funds are CA Core Fixed Income Fund, LLC, a Delaware limited liability company, and CA Core Fixed Income Offshore Fund, Ltd, a Cayman Islands company (collectively "Core Funds").[27]  Commonwealth served as investment adviser to the Core Funds from at least 2006 through April 25, 2012.[28]  The Core Funds filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware on October 25, 2011.[29]

   8.    The CA Funds are two hedge funds created in 2005.[30]  The funds operate as parallel investment vehicles with similar investment objectives, strategies, and restrictions.[31]  The CA Funds

---

[21]   *Id.*

[22]   *Id.*

[23]   *Id.*

[24]   *Id.*

[25]   Ex. 1, Answer at ¶ 11; Ex. 2, Complaint at ¶ 11.

[26]   *Id.*

[27]   *Id.*

[28]   *Id.*

[29]   *Id.*

[30]   Ex. 1, Answer at ¶ 12; Ex. 2, Complaint at ¶ 12.

[31]   *Id.*

are CA High Yield Fund, LLC, a Delaware limited liability company, and CA High Yield Offshore Fund, Ltd, a Cayman Islands company (collectively "CA Funds"). [32]  Commonwealth served as investment adviser to the CA Funds from at least 2006 through April 25, 2012. [33]  The CA Funds filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware on October 25, 2011.[34]

9.     At all relevant times, the Net Asset Value ("NAV") for each of the Commonwealth-managed funds was determined using the asset values supplied by Commonwealth.[35]  The NAVs reflected the investment performance of the funds and were used to calculate management fees paid to Commonwealth.[36]

10.     In 2007, Commonwealth received management fees of $4,108,431.19.[37]  In 2008, Commonwealth received management fees of $5,485,588.25, of which $1,998,168 was paid by the Sand Spring III funds.[38]

### The Market

11.     By the beginning of 2007, Defendants had invested a significant portion of the assets of the CA Funds and the Core Funds in residential mortgage-backed securities ("RMBS").[39]

---

[32]     *Id.*

[33]     *Id.*

[34]     *Id.*

[35]     Ex. 6, June 13, 2014 Deposition of Michael Perini ("Perini June 13, 2014 Dep."), 305:14 to 307:14.

[36]     Ex. 7, May 13, 2014 Deposition of Walter Morales ("Morales May 13, 2014 Dep."), at 69:4 to 70:12.

[37]     Ex. 8, Defendants' Responses to the First Set of Requests for Admissions of Plaintiff ("RFA Responses"), Resp. No. 9.

[38]     *Id.* at Resp. Nos. 10, 11.

[39]     Ex. 1, Answer at ¶ 19; Ex. 2, Complaint at ¶ 19.

12.    During the latter part of 2007, Morales understood that financial markets were "in the midst of a credit crisis."[40]

13.    Significant price declines occurred in RMBS by June 2007 and worsened by November 2007.[41]

14.    Morales understood that the market was "getting crushed."[42]

## The Collybus Collateralized Debt Obligation

15.    In the latter part of 2007, Defendants participated in the creation of a new cash collateralized debt obligation ("CDO") named Collybus.[43]

16.    CDOs are investment vehicles secured by pools of asset-backed securities, such as RMBS.[44]  A cash CDO such as Collybus sells securities called notes to investors at different levels of priority (which are called the "tranches" of the CDO) in exchange for money.[45]  The notes entitle the investors who hold them to receive returns from the earnings of the asset-backed securities that make up the CDO (such as RMBS), according to the priority of the tranche of the CDO in which the investor is invested.[46]  For example, if a CDO received $100 in returns, the $100 would be used to pay the purchasers of A level notes, then B level notes, C level notes, etc. until the returns were

---

[40]    Ex. 9, CW-II-03034746-49, August 9, 2007 e-mail from Morales to Haag, re. Follow-up on Clients Account Valuations, at CW-II-03034746

[41]    Ex. 10, Answer of Commonwealth Defendants in *Broyles, et. al., v. Cantor Fitzgerald, et al.*, No. 10-cv-857-JJB-SCR (M.D. La.) (Dkt. No. 52) ("Broyles I Answer"), at ¶110; *see also* Ex. 11, First Amended Complaint in *Broyles, et. al., v. Cantor Fitzgerald, et al.*, No. 10-cv-857-JJB-SCR (M.D. La.) (Dkt. No. 40) ("Broyles I Complaint"), at ¶ 110.

[42]    Ex. 12, CW-II-06253342, Nov. 7, 2007 e-mail from Morales to Noel Caldwell.

[43]    Ex. 13, Answer of Commonwealth Defendants in *Broyles, et. al., v. Cantor Fitzgerald, et al.*, No. 10-cv-854-JJB-SCR (M.D. La.) (Dkt. No. 128) ("Broyles II Answer"), at ¶ 38; *see also* Ex. 14, Second Amended Restated Complaint in *Broyles, et. al., v. Cantor Fitzgerald, et al.*, No. 10-cv-854-JJB-SCR (M.D. La.) (Dkt. No. 87) ("Broyles II Complaint"), at ¶ 38.

[44]    Ex. 15, Expert Report of Michael Youngblood, ¶ 28.

[45]    *Id.*

[46]    *Id.*

extinguished.[47]  The most subordinate notes, also known as the E tranche or Equity position, sit at the lowest level of priority and accordingly suffer the first losses if the returns on the securities that make up the CDO are insufficient.[48]

17.    To create the Collybus CDO, funds managed by Commonwealth and Morales contributed RMBS that Commonwealth had valued at $260 million.[49]  The same Commonwealth-managed funds received in return approximately $100 million in cash and C tranche notes valued at $35 million, D tranche notes valued at $44 million, and E tranche notes valued at $51 million.[50]

18.    Because of the way the Collybus CDO was structured, the C, D, and E tranches were the lowest tranches and would be the first to experience problems if the underlying loans lost value.[51]  These lowest tranches were the tranches purchased by Commonwealth-managed Funds.[52]

19.    Despite market declines during that same period, Commonwealth carried fund assets at constant levels between June and November 2007, when the Commonwealth-managed funds sold the RMBS to the Collybus CDO.[53]  Stated another way, Commonwealth contributed the RMBS in November 2007 at prices that had not been adjusted since June 2007, despite the market decline in such securities in the interim.

---

[47]    With respect to the order of payments in Collybus, the Offering Circular for Collybus provides, "Except as otherwise described in the Priority of Payments, the relative order of seniority of payment of each Class on each Distribution Date is as follows: *first*, Class A-1 Notes, *second* Class A-2 Notes, *third* Class A-3 Notes, *fourth* Class B Notes, *fifth,* Class C Notes, *sixth,* Class D Notes and *seventh*, Subordinate Securities . . ." *See* Ex. 16, Collybus Offering Circular CAN00030021-268, at CAN00030078.

[48]    Ex. 15, Expert Report of Michael Youngblood, ¶ 28.

[49]    Ex. 13, Broyles II Answer, at ¶ 38; see also Ex. 14, Broyles II Complaint, at ¶ 38.

[50]    *Id.*

[51]    *Id.*

[52]    *Id.*

[53]    Ex. 17, June 12, 2014 Deposition of Michael Perini, at 160:5 to 162:14.

20.    Commonwealth was the "collateral manager" to the CDO.[54]  In this position, Commonwealth received monthly reports on the performance of Collybus's underlying collateral.[55]

### Misuse of Fund Assets to Create the CDO

21.    Commonwealth's internal policy manual required it to comply with the Advisers Act Custody Rule (Rule 206(4)-2), which mandates that client assets and funds be maintained with qualified custodians "in an account either under the client's name or under the adviser's name as agent or trustee for its clients."[56]  A Private Placement Memoradum (or "PPM") is a document explaining the offering of securities to investors and includes, among other things, a description of the investment and the investment manager's policies and practices.  Sand Spring III's PPM provided that the fund's accounts would be maintained with the fund's prime broker, that all assets that were held by the prime broker would be carried in the name of the fund, and beneficial ownership in the name of the fund would be recorded on the books of the prime broker.[57]

22.    To facilitate the closing of Collybus on November 9, 2007, Commonwealth used $35 million that belonged to Sand Spring III to purchase RMBS from other Commonwealth-advised funds and then sold the RMBS to the CDO.[58]

---

[54]    Ex. 18, Feb. 27, 2015 Deposition of Walter Morales ("Morales Feb. 27, 2015 Dep."), at 573:7 to 577:25; Ex. 1, Answer, at ¶ 17; Ex. 2, Complaint at ¶ 17.

[55]    Ex. 7, Morales May 13, 2014 Dep., at 210:25 to 211:7 (Morales routinely received trustee reports showing shortfalls in the waterfall of payments coming into the Collybus CDO); Ex. 15, Expert Report of Michael Youngblood, ¶ 365 (discussing Collybus CDO Monthly Trustee Reports); Ex. 19, MOLEW-0157281, Feb. 7, 2008 email from Jerry Rhodus copying Morales, re. FW: Collybus Monthly; Ex. 20, MOLEW-0157282-342, January 2008 Collybus Monthly Report; Ex. 21, CW-II-05327135-94, February 2008 Collybus Monthly Report; Ex. 22, MP-SEC00017625-27, April 10, 2008 email from Vallee to Morales, re. News flash. . . .; Ex. 23, MP-SEC00017895-949, March 2008 Collybus Monthly Report; Ex. 24, HO-11058-9798-0013192-247, April 2008 Collybus Monthly Report; Ex. 25, CW-II06082456, email from Rhodus to Morales, re. FW: Collybus 2007-1 Reports; Ex. 26, CW-II-06082459-512, May 2008 Collybus Monthly Report.

[56]    Ex. 27, SEC-CWA-P-0029394-585, Commonwealth Compliance Manual, at SEC-CWA-P-0029417-18.

[57]    Ex. 28, Deposition Exhibit 198, July 23, 2008 email from Despot to Green, re. Pricing Policy Follow-Up, attaching Sand Spring III Ltd. PPM and Sand Spring III LLC, at CII-SEC0000894, CII-SEC0000827.

[58]    Ex. 7, Morales May 13, 2014 Dep., at 289:12 to 292:6.

23.     In connection with this transaction, Commonwealth transferred $35 million from Sand Spring III's account at its prime broker into an account titled in Commonwealth's own name at a broker-dealer.[59]

24.     Morales personally signed authorizations for at least $25 million of this transfer on October 24, 2007.[60]  Morales also personally authorized transfers of funds from Commonwealth's account back to Sand Spring III following the close of Collybus.[61]

25.     Commonwealth ultimately returned about $34.7 million of these funds to Sand Spring III but failed to repay the fund approximately $300,000.[62]

### Crestline's Investment in Collybus

26.     One of Commonwealth's largest investment advisory clients was an institutional investor called Crestline Investors, Inc. ("Crestline").[63]  Crestline is itself an investment adviser to several large institutional clients including pension funds and hedge funds and had discretionary authority to make investment decisions for its clients.[64]  Crestline invested approximately $149 million of its clients' assets in Commonwealth's Sand Spring III funds between August 2007 and May 2008.[65]

---

[59]     Ex. 7, Morales May 13, 2014 Dep., at 289:12 to 291:23; Ex. 29, MOLEW-0156786, Nov. 14, 2007 email from Rhodus to Gottshall, re. Stone & Youngberg 103107 statement.

[60]     Ex. 30, CW-II-06253246-47, Nov. 2, 2007 email from Rhodus to Caldwell, re. wire explanation, attaching Oct. 24, 2007 wire authorization of $25,000,000 signed by Morales; Ex. 31, Walter Morales' Answers to First Set of Interrogatories of Plaintiff, Resp. No. 3 ("It is true that Mr. Morales authorized the transfers.").

[61]     *See, e.g.*, Ex. 32, SEC-SY-233824, Nov. 15, 2007 wire authorization of $9,000,000 signed by Morales.

[62]     Ex. 7, Morales May 13, 2014 Dep., at 293:24 to 294:11; Ex. 33, CW-II-06078781, Apr. 10, 2008 email from Rhodus to Morales, re. S&Y "due from affiliates" receivable and needed SPO money.

[63]     Ex. 1, Answer at ¶ 13; Ex. 2, Complaint at ¶ 13; Ex. 34, August 7, 2014 Deposition of Alexander Green ("Green Dep."), at 228:18 to 228:24.

[64]     Ex. 1, Answer at ¶ 13; Ex. 2, Complaint at ¶ 13.

[65]     *Id.*

27.     Until February 2008, Crestline was the only investor in Sand Spring III.[66]  At all times relevant to this action, Crestline was the largest investor in Sand Spring III.[67]

28.     Crestline did not want to expose its clients to investment risks associated with investing in a fund that was overly concentrated in any one asset.[68]  A Crestline employee specifically informed Morales in a November 6, 2007 email that Crestline was "concerned with having a very large portion of the [Sand Spring III] fund invested in one line item."[69]  Morales responded, "In the event you guys are uncomfortable with the exposure, we can reduce it or eliminate it because we have other accounts where I would like to put it."[70]  The following day, Morales sent a separate email to the same Crestline employee, writing, "S[e]lling this is not a problem so if you guys don't like it I can sell it or take more in the other sand spring funds."[71]

29.     Prior to the Collybus CDO closing on November 9, 2007, Morales assured Crestline that Sand Spring III would invest only about $12 million in Collybus.[72]

30.     Just a few days later, Defendants caused Sand Spring III to invest approximately $49 million in the Equity tranche of Collybus.[73]  The Equity tranche was the lowest priority tranche in the CDO and thus bore the highest risk of losses.[74]

---

[66]     Ex. 35, HO-11058-1895-905, Sand Spring Capital III, Partnership Book Allocation (Aug. 1, 2007 to Dec. 31, 2007); Ex. 36, HO-11058-2086, *et seq.* (selected pages), Sand Spring Capital III, Partnership Book Allocation (Jan. 2008 to Dec. 2008); *see also* Ex. 37, Deposition Exhibit 274, CII-SEC0037349-50, Aug. 11, 2008 email chain (Green of Crestline identifying Crestline investment names).

[67]     Ex. 36, HO-11058-2086, *et seq.* (selected pages), Sand Spring Capital III, Partnership Book Allocation (Jan. 2008 to Dec. 2008); Ex. 38, SEC-Spectrum-E-0631888, Sand Spring Capital III, Partnership Book Allocation (Jan. 2008 to Dec. 2008).

[68]     Ex. 34, Green Dep., at 150:2-152:9.

[69]     Ex. 39, CW-II-03042018, Nov. 6, 2007 email from Green to Morales, re. Crestline.

[70]     *Id.*

[71]     Ex. 40, CII-SEC0033197, Nov. 7, 2007 email from Morales to Green, re. Crestline.

[72]     Ex. 41, Deposition Exhibit 47, CII-SEC0000711-73, Crestline contemporaneous notes, at CII-SEC0000754-55.

31.    Defendants concluded even before Collybus was formed that *at least* the Equity portion of the CDO would be completely worthless.[75]

32.    By November 20, 2007, approximately 35% of Sand Spring III's assets were invested in Collybus.[76]

33.    Shortly thereafter, Crestline's managing director contacted Morales and complained about the size of Sand Spring III's Collybus investment.[77]

34.    During a November 30, 2007 telephone call with Crestline, Morales acknowledged that the large size of the investment in Collybus was not consistent with his previous discussions with Crestline about Crestline's investment objective of investing in a diversified fund and agreed that Commonwealth would reduce Sand Spring III's Collybus investment to 10% or less of Sand Spring III's assets.[78]

35.    On December 3, 2007, Morales confirmed this agreement by sending an email to Crestline's managing director stating that "[t]he exposure of Sand Spring III to the Collybus CDO will be limited to 10% of the equity of the fund.  That limit will be applied to the exposure and not the capital commitment."[79]

36.    Defendants initially reduced Sand Spring III's exposure to the Collybus CDO in December 2007 by causing part of Sand Spring III's investment in the Equity tranche of the

---

[73]    Ex. 1, Answer at ¶ 28; Ex. 2, Complaint at ¶ 28.

[74]    Ex. 42, Expert Report of Edwin Witham, ¶ 94.

[75]    Ex. 43, CAN00201379-80, Nov. 3, 2007 email from Morales to Hubbell, re. Question, at CAN00201379.

[76]    Ex. 1, Answer at ¶ 28; Ex. 2, Complaint at ¶ 28; Ex. 8, RFA Responses, Resp. No. 1.

[77]    Ex. 1, Answer at ¶ 29; Ex. 2, Complaint at ¶ 29.

[78]    *Id.*

[79]    Ex. 1, Answer at ¶ 30; Ex. 2, Complaint at ¶ 29.

Collybus CDO to be traded from Sand Spring III to another Commonwealth-managed fund, Sand Spring I.[80]

37.     At approximately the same time that Morales caused Sand Spring III to trade a part of the Equity tranche to Sand Spring I, Morales was already taking steps to liquidate Sand Spring I.[81]

38.     As a result of these trades between Commonwealth-managed funds, the percentage of Sand Spring III's assets that were invested in the Collybus CDO decreased from 35.4% in November 2007 to 12.3% in December 2007, when the year-end financial statements for Sand Spring III were provided to investors.[82]

39.     About two months later, in February, 2008, as part of the liquidation of the assets of Sand Spring I, and without disclosure to Crestline, Commonwealth traded a portion of the Collybus CDO's Equity tranche back into Sand Spring III.[83]

40.     As a result of this transfer, the percentage of Sand Spring III's assets that were invested in the Collybus CDO increased from 12.3% in January 2008 to 22% in February 2008.[84]

41.     Morales authorized the trade of the Collybus CDO Equity tranche from Sand Spring I back to Sand Spring III, in "violation" of the representation that Defendants made to Crestline.[85]

42.     In March 2008, in furtherance of the liquidation of Sand Spring I, Commonwealth traded parts of the C and D tranches of Collybus from Sand Spring I to Sand Spring III, further

---

[80]     Ex. 7, Morales May 13, 2014 Dep., at 204:19 to 204:22.

[81]     Ex. 44, CW-II-06704306-07, Dec. 26, 2007 email from Colegrave to Linn and Morales, re. Sand Spring, Ltd.; Ex. 45, CW-II-06704341, June 1, 2008 email from Morales to Colegrave, re. Sand Spring Capital.

[82]     Ex. 8, RFA Responses, Resp. Nos. 1-2.

[83]     Ex. 7, Morales May 13, 2014 Dep., at 204:23 to 205:2.

[84]     Ex. 8, RFA Responses, Resp. Nos. 3-4.

[85]     Ex. 7, Morales May 13, 2014 Dep., at 206:5 to 207:3.

increasing Sand Spring III's exposure to Collybus, contrary to Defendants' representations to Crestline.[86]

43.     As a result of this transfer, by March 31, 2008, the percentage of Sand Spring III's assets that were invested in the C, D, and Equity tranches of the Collybus CDO were over 25%.[87]

44.     Crestline subsequently made additional investments in Sand Spring III, including investments of $1 million in February 2008, $4.35 million in March 2008, $1.6 million in April 2008, and $1 million in May 2008.[88]

45.     These new investments resulted in additional profit for Morales and Commonwealth because Commonwealth received compensation from Sand Spring III investors in the form of management fees that were determined as a percentage of fund assets.[89]

46.     In a phone call with Crestline on May 9, 2008, Morales and another Commonwealth employee represented that only 10% of the portfolio was invested in the Collybus CDO.[90]

47.     On June 11, 2008, Morales and another Commonwealth employee met with Crestline and presented a PowerPoint presentation that contained information about the make-up of Sand Spring III's investment portfolio.[91]   The PowerPoint presentation showed that 5.56% of the

---

[86]     Ex. 46, MOLEW-0160709-710, Mar. 28, 2008 email from Robertson to specsupport@bear.com (directing trades of Collybus from 2SAN (Sand Spring I) and 2SAP (Sand Spring Ltd.) to 2SAS (Sand Spring III)); Ex. 47, SEC-SY-013654-678, Mar. 28, 2008 email from Robertson to Jennings, attaching spreadsheet of Bear Stearns trades.

[87]     Ex. 42, Expert Report of Edwin Witham, ¶ 62; Ex. 48, SEC-Spectrum-E-0082223.xls, Sand Spring III holdings as of March 31, 2008; Ex. 8, RFA Responses, Resp. No. 5.

[88]     Ex. 1, Answer at ¶ 34; Ex. 2, Complaint at ¶ 34.

[89]     Id.

[90]     Ex. 49, Deposition Exhibit 47, CII-SEC0000711-73, Crestline contemporaneous notes, at CII-SEC0000745.

[91]     Ex. 41, Deposition Exhibit 47, CII-SEC0000711-73, June 11, 2008 Crestline contemporaneous notes reflecting date and substance of meeting, at CII-SEC0000742-43; Ex. 34, Green Dep., at 70:4 to 70:25.

portfolio was invested in a category called "CDO."[92]  To the contrary, however, through June 2008, the Collybus CDO made up 25.1% (March), 23.6% (April), 21.7% (May), and 32.9% (June) of the value of the investment portfolio of Sand Spring III.[93]

48.    In July 2008, Morales told Crestline that the value of Sand Spring III was down 15% for the month because of the fund's investment in Collybus.[94]  When a Crestline employee asked how Collybus could be responsible for a 15% decline in the fund's value when Crestline had been told that Collybus was only 5% of the portfolio, Morales responded, "I guess we're fired."[95]

**Defendants Overvalued Commonwealth Funds' Investments in Collybus for Months**

49.    Throughout this period, Commonwealth carried the Equity tranche of the Collybus CDO at between 100% and 102% of par value.[96]  Par value is the amount investors will receive if none of the RMBS that make up the CDO incurs any losses.

50.    Commonwealth's decision to value the Equity tranche at or above par value throughout the spring of 2008 was inconsistent with its own negotiations surrounding higher priority tranches during that same time period, putting Defendants on notice that those higher priority tranches were worth less than par value.  For example, on December 3, 2007, the investment bank with whom Commonwealth had created the Collybus CDO offered to sell the A3 tranche notes of Collybus to Commonwealth at a price of 85 percent of par value. [97]

---

[92]    Ex. 50, Deposition Exhibit 232, CII-SEC0000078-114, Commonwealth PowerPoint Presentation, at CII-SEC0000082.

[93]    Ex. 8, RFA Responses, Nos. 5-8.

[94]    Ex. 34, Green Dep., at 54:25 to 55:13.

[95]    *Id.* at 54:22 to 56:8.

[96]    Ex. 1, Answer at ¶ 52; Ex. 2, Complaint at ¶ 52.

[97]    Ex. 51, CAN00073948, Dec. 3, 2007 email from Vallee to Morales, re. Collybus I additional tranches.

51.    Valuing more senior Collybus tranches at substantially below par while valuing the Equity tranche – which carried the greatest risk of losses in a CDO – at levels above the more senior A2 tranche "makes no sense."[98]

52.    CDOs such as Collybus have various "triggers" that, in the event cash flows to more senior tranches become imperiled, automatically kick in to stop further interest payments to more junior tranches, and instead redirect cash flows from the underlying collateral away from the more junior tranches to pay more senior tranches.[99]  One such trigger is called an "overcollateralization" or "OC" trigger, which measures the ratio between (1) the par value of the performing collateral (discounted for credit deterioration and downgrades) and (2) the par value of the senior tranches outstanding.[100]  If collateral deteriorates to a sufficient degree that the CDO's ability to pay senior tranches is threatened, the OC trigger redirects collateral cash flows that would normally be paid to investors in the junior tranches to pay investors in the more senior tranche interest and then use all remaining funds to pay down senior tranche principal until the ratio of collateral principal to tranche principal returns to levels above the trigger points.[101]

53.    As the CDO's collateral manager, Morales was provided with reports that disclosed that the collateral underlying the CDO had performed so poorly that, because of the overcollateralization triggers, payments to the lower rated tranches had in fact been cut off.[102]

---

[98]    Ex. 7, Morales May 13, 2014 Dep., at 252:15 to 252:19.

[99]    Ex. 42, Expert Report of Edwin Witham, ¶ 102.

[100]    *Id.*

[101]    *Id.*

[102]    Ex. 7, Morales May 13, 2014 Dep., at 210:25 to 211:7 (Morales received trustee reports); Ex. 15, Expert Report of Michael Youngblood, ¶ 365 (discussing Collybus CDO Monthly Trustee Reports); Ex. 22, MP-SEC00017625-27, Apr. 10, 2008 email from Tom Vallee to Morales re. News flash. . . .; Ex. 23, MP-SEC00017895-949, March 2008 Collybus Monthly Report; Ex. 24, HO-11058-9798-0013192-247, April 2008 Collybus Monthly Report.

54.    By March 31, 2008, the value of the RMBS that made up Collybus had deteriorated to a sufficient extent that the D tranche had failed overcollateralization tests, and there was no longer sufficient non-defaulted RMBS underlying the CDO to repay the principal on the D tranche notes in full.[103] This stopped all further interest payments to the investors in the D tranche, as well as to investors in the Equity tranche.

55.    By the end of the following month, April 2008, shortfalls in the performance of the RMBS underlying Collybus resulted in payments to investors in the C tranche being cut off as well.[104]

56.    The prices ascribed by Commonwealth to the various tranches of the Collybus CDO, including the Equity tranche, were not correct.[105]

57.    As a result of the misstated values of the Collybus CDO, the value of Sand Spring III's assets was overstated by approximately $12.4 million in March 2008, $31.1 million in April 2008, $49.4 million in May 2008, and $25.4 million in June 2008.[106]

58.    Commonwealth later restated its monthly performance results for several of the early months of 2008.[107]  By June 30, 2008, the Sand Spring III funds' investment in Collybus' equity

---

[103]    Ex. 15, Expert Report of Michael Youngblood, ¶ 365 (discussing Collybus CDO Monthly Trustee Reports); Ex. 22, MP-SEC00017625-27, Apr. 10, 2008 email from Tom Vallee to Morales re. News flash. . .; Ex. 23, MP-SEC00017895-949, March 2008 Collybus Monthly Report.

[104]    Ex. 15, Expert Report of Michael Youngblood, ¶ 365; Ex. 24, HO-11058-9798-0013192-247, April 2008 Collybus Monthly Report

[105]    Ex. 3, Morales Aug. 26, 2009 Inv. Test., at 238:25 to 239:17.

[106]    Ex. 8, RFA Responses, Resp. Nos. 5-8.

[107]    Ex. 3, Morales Aug. 26, 2009 Inv. Test., at 58:24 to 59:24 (fund was repriced in summer 2008 and statements reissued in September 2008); Ex. 52, Deposition Exhibit 217, CII-SEC0038064-95, Oct. 3, 2008 email from Spectrum to Crestline attaching revised March, April, and June 2008 investor statements for Sand Spring Capital III Ltd.

17

tranche – which had been purchased at par value and then carried at or above par value throughout the Spring 2008 – was valued at $0.[108]

**<u>The Valuation Committee Minutes</u>**

59.    In the summer of 2008, after a firm that had conducted due diligence on Commonwealth issued a report that raised questions about asset pricing at Commonwealth, Crestline sent Commonwealth a series of written questions asking, among other things, whether Commonwealth had a valuation committee and, if so, whether the committee maintained minutes of its meetings.[109]

60.    On July 8, 2008, having been told that Commonwealth had a valuation committee that maintained minutes of its meetings, Crestline requested copies of those minutes.[110]

61.    Later that same day, Morales prepared minutes purporting to describe valuation committee meetings.[111]

62.    The minutes prepared by Morales falsely reflected that "regular" meetings of a valuation committee took place on January 25, 2008, and April 29, 2008.[112]  In fact, Commonwealth did not have a formal valuation committee in January or April 2008, and no "regular" meetings took place on the dates set forth in the minutes Morales prepared.

63.    On May 30, 2008, subsequent to the dates of the purported meetings of Commonwealth's valuation committee reflected in the minutes drafted by Morales and sent to

---

[108]    Ex. 53, Deposition Exhibit 62, Aug. 8, 2008 email from Spectrum to Rhodus, re. Balance Sheet Analysis (holdings reports) progress . . ., attaching Sand Spring III June 30, 2008 Holdings Report.

[109]    Ex. 1, Answer at ¶ 50; Ex. 2, Complaint at ¶ 50.

[110]    Ex. 7, Morales May 13, 2014 Dep., at 108:18 to 108:25.

[111]    Ex. 7, Morales May 13, 2014 Dep. at 144:3 to 144:7; Ex. 54, OCIE-MIRO-0168092-93, purported Apr. 29, 2008 Commonwealth valuation committee meeting minutes.

[112]    Ex. 7, Morales May 13, 2014 Dep., at 105:4 to 107:21.

Crestline, Morales emailed Commonwealth's outside counsel and stated, "I am also creating a valuation committee to oversea [sic] [a Commonwealth employee's] work.  I probably should have done this a long time ago but I guess it is better late than never."[113]

64.    Morales provided the minutes to Commonwealth employees who, at Morales's direction, sent the minutes dated April 29, 2008, to Crestline.[114]

65.    When confronted, Morales acknowledged that creating meeting minutes that gave the impression that specific meetings took place on specific dates "was not the right thing to do."[115]

66.    Morales believed that having a valuation committee that reviewed prices of fund assets would be important to Crestline.[116]

### The June Cross Trades Between Commonwealth-Managed Funds

67.    A "cross-trade" in this context occurs when an investment adviser causes one of his clients to sell an asset to or purchase an asset from another fund the adviser manages.[117]  Broadly, because an adviser has a duty to the seller to secure the highest possible price and a duty to the buyer to pay the lowest possible price, cross-trades create a conflict of interest situation.[118]

68.    On July 2, 2008, Commonwealth filed a Form ADV with the SEC stating that Commonwealth "does not execute cross-trades with any CA Fund or Sand Spring fund."[119]  The

---

[113]    Ex.55, CW-II-06603496-97, May 30, 2008 email from Morales to Linn re. FW: Mark to Model, at CW-II-06603496.

[114]    Ex.1, Answer at ¶ 51; Ex. 2, Complaint at ¶ 51.

[115]    Ex. 7, Morales May 13, 2014 Dep., at 107:12 to 108:11.

[116]    *Id.* at 110:18-25.

[117]    Ex. 56, June 23, 2015 Deposition of Stephanie Djinis, at 37:19-22.

[118]    *Id.* at 37:23-38:13.

[119]    Ex. 57, CII-SEC0009273-89, July 2, 2008 Commonwealth Form ADV, Part II, at CII-SEC0009283.

same representation appeared in Commonwealth's Forms ADV dated March 23, 2007, September 5, 2007, and March 26, 2008.[120]

69.     The Commonwealth Compliance Manual in effect at the time also prohibited cross-trades between Commonwealth-managed funds.[121]  Morales and Commonwealth had also been warned by the SEC that cross-trading between funds was improper.  The SEC expressly advised Morales by letters of June 14, 2000, and August 15, 2002, that Commonwealth's cross-trading of securities between managed client accounts was illegal and violated the antifraud provisions of the Investment Advisers Act.[122]  In addition, prior to June 2008, Commonwealth's outside counsel advised Commonwealth and Morales how to execute trades so that they would not be considered cross-trades.[123]

70.     In NAV reports sent to investors throughout the spring of 2008, Sand Spring III's investment in the Equity tranche of Collybus was priced at between 100% and 102% of par value.[124]  However, as discussed in paragraphs 52-55, above, by April 2008, Defendants had received reports that indicated that the Equity tranche of Collybus was declining rapidly.[125]

---

[120]    Ex. 58, CII-SEC0003199-215, March 23, 2007 Commonwealth Form ADV, Part II, at CII-SEC0003209; Ex. 59, CW-II-05042460-76, September 5, 2007 Commonwealth Form ADV, Part II, at CW-II-05042471; Ex. 60, OICE-MIRO-0030478-94, March 26, 2008 Commonwealth Form ADV, Part II, at OCIE-MIRO-0030489.

[121]    Ex. 1, Answer at ¶ 33; Ex. 2, Complaint at ¶ 33.

[122]    Ex. 61, OICE-MIRO-0859976-81, June 14, 2000 letter from the SEC to Morales, at OICE-MIRO-0859976-77; Ex. 62, CW-II-05891392-396, August 15, 2002 letter from the SEC to Morales, at CW-II-05891392-93.

[123]    Ex. 63, KLG-CWA-060987-88, Dec. 13, 2007 email chain between Linn and Morales re. Cross Trades.

[124]    Ex. 1, Answer at ¶ 52; Ex. 2, Complaint at ¶ 52.

[125]    Ex. 7, Morales May 13, 2014 Dep. at 210:25 to 211:7 (Morales routinely received trustee reports showing shortfalls in the waterfall of payments coming into the Collybus CDO); Ex. 15, Expert Report of Michael Youngblood, ¶ 365 (discussing Collybus CDO Monthly Trustee Reports); Ex. 22, MP-SEC00017625-27, Apr.10, 2008 email from Tom Vallee to Morales re. News flash. . . .; Ex. 23, MP-SEC00017895-949, March 2008 Collybus Monthly Report; Ex. 24, HO-11058-9798-0013192-247, April 2008 Collybus Monthly Report; Ex. 25, CW-II06082456, from Jerry Rhodus to Morales re. FW: Collybus 2007-1 Reports; Ex. 26, CW-II-06082459-512, May 2008 Collybus Monthly Report.

71.     To offset losses in Sand Spring III that would be revealed once Commonwealth marked the investment in the Equity tranche to reflect its accurate, current value, in June 2008, Commonwealth caused Sand Spring III to purchase securities from the CA Funds and the Core Funds at prices below Commonwealth's own valuation for those securities.[126]

72.     Internal Commonwealth documents created before the June cross-trades indicated that Commonwealth intended to have the CA Funds and Core Funds purchase Collybus A2 tranche notes.[127]   The internal documents also showed that, after the purchase of the A2 notes, Commonwealth intended to "mark" or value those notes at a value well above their purchase price, which would have had the effect of offsetting losses to the CA Funds and Core Funds that resulted from cross-trading securities to Sand Spring III at below-market values.[128]

73.     Morales stated, "I want to blow a hole in the Core Funds and patch it with A2."[129]

74.     On June 4, 2008, Defendants entered into an agreement to buy the Collybus A2 tranche notes.[130]   Commonwealth caused its funds to purchase the A2 notes at a price that was 72.75% of their par value.[131]

75.     Later in June 2008, Commonwealth entered into a series of cross-trades of bonds that were sold by the CA Funds and Core Funds and purchased by Sand Spring III at prices well below the amount that Commonwealth was valuing those bonds at the time.[132]

---

[126]     Ex. 64, OCIE-MIRO-0188119-22, June 18, 2008 email, re. FW: CCFLLC and LTD Realized Loss Review, at OCIE-MIRO-0188121; Ex. 1, Answer at ¶ 59; Ex. 2, Complaint at ¶ 59.

[127]     Ex. 65, June 27, 2014 Deposition of Ryan Marsh, at 58:1-60:4; Ex. 6, Perini June 13, 2014 Dep., at 534:10-535:19.

[128]     *Id.*

[129]     Ex. 7, Morales May 13, 2014 Dep., at 245:4 to 245:9.

[130]     Ex. 1, Answer at ¶ 55; Ex. 2, Complaint at ¶ 55.

[131]     Ex. 66, OCIE-MIRO-0245252-67; Ex. 67, CAN00101994, June 4, 2008 electronic chat between Perini and Matthews.

76.     Those trades disadvantaged the CA Funds and the Core Funds.[133]  On June 18, 2008, the fund administrator for the Commonwealth-managed funds sent a chart to Morales's assistant at Commonwealth listing eighteen bonds sold from certain funds to Sand Spring III on June 11 and 12, 2008.[134]

77.     For each bond, the chart reflected the original cost, Commonwealth's May 31, 2008 valuation, the June 2008 sale price of the bond, and the resulting loss to the fund that sold it.[135]  For example, the chart reflected that on June 11, 2008, Commonwealth caused a Core Fund to sell bonds to Sand Spring III at $34.75 per bond even though Commonwealth valued those same bonds at $88.50 as recently as May 31, 2008.[136]  That transaction alone resulted in a $3.4 million loss to the Core Funds.[137]

78.     Prior to completing the cross-trades, the administrator warned Commonwealth that all the transactions reflected on the chart resulted in a total net loss to the Core Funds of over $27 million.[138]

79.     Morales's assistant forwarded the administrator's email with the attached chart to Morales and others at Commonwealth on June 18, 2008.[139]

---

[132]     Ex. 64, OCIE-MIRO-0188119-22, Jun. 18, 2008 email chain re. FW: CCFLLC and LTD Realized Loss Review, at OCIE-MIRO-0188121.

[133]     Ex. 18, Morales Feb. 27, 2015 Dep., at 640:22 to 641:8; Ex. 68, KLG-CWA-008678-726, Sept. 9, 2008 email from Morales to Linn, re. Emailing: bear trades, attaching summary of cross-trades.

[134]     Ex. 1, Answer at ¶ 59; Ex. 2, Complaint at ¶ 59.

[135]     Ex. 64, OCIE-MIRO-0188119-22, Jun. 18, 2008 email chain re. FW: CCFLLC and LTD Realized Loss Review, at OCIE-MIRO-0188121.

[136]     *Id.*

[137]     *Id.*

[138]     *Id.*

[139]     Ex. 1, Answer at ¶ 60; Ex. 2, Complaint at ¶ 60.

80.     Within hours of receiving and reviewing the materials, Morales told his assistant, "that is what we were expecting."[140]  Morales's assistant relayed Morales's response to the fund administrator later that same day.[141]

81.     On June 17, 2008, Morales and another Commonwealth employee signed a letter to the prime broker for the Commonwealth-managed funds involved in the June cross-trades representing, among other things, that the trades were "consistent with our governing documents and policies," "valued by us at prevailing market prices," and are "suitable for us and in our best interests and the best interests of our investors."[142]

82.     Contrary to these representations, Morales subsequently admitted in a letter to a proposed independent fiduciary that the June trades "were cross trades between the funds . . . [that] did not conform to the firm's policies."[143]  Commonwealth's Compliance Manual provided:

> When crossing securities from one account to another, it is imperative that Commonwealth establishes that the client selling the security was not damaged by Commonwealth's efforts to cross the security.  This can only be done by soliciting bids from numerous brokers and crossing the security at a price greater than the best bid obtained.  Similarly, the client purchasing the security must not execute above the market.  Commonwealth will document that the security was available at a price equal to or higher than the crossing price or that the security was not offered at the time of the cross.  Again, reputable sources must be used to establish a value for the security and provide additional support for the price paid by the client.[144]

---

[140]    Ex. 69, CW-III-0014344, Jun. 18, 2008 email from Robertson to Spectrum re. CCFLLC and LTD Realized Loss Review.

[141]    Ex. 1, Answer at ¶ 60; Ex. 2, Complaint at ¶ 60.

[142]    Ex. 70, Deposition Exhibit 505, OCIE-MIRO-0216464-68, June 16, 2008 email from Perini to Bear Stearns re. Commonwealth transfers, attaching June 17, 2008 Commonwealth Letter to Bear Stearns, at OCIE-MIRO-0216466.

[143]    Ex. 71, CW-II-06628340-41, August 13, 2008 letter from Morales to Nell Hennessy, at CW-II-06628341.

[144]    Ex. 27, SEC-CWA-P-0029394-585, Commonwealth Compliance Manual, at SEC-CWA-P-0029402.

## The Purchase and Repricing of the Collybus A2 Tranche Notes

83.     After causing funds it managed to purchase the Collybus A2 notes, Commonwealth engaged Kroll, Inc. ("Kroll") to value the Commonwealth-managed funds' investments in Collybus.[145]

84.     In the course of that engagement, Kroll personnel were told by Morales that the purchase of the A2 notes was part of a "package deal" for the purchase of the A2 notes along with the notes of the subordinate or Equity tranche and other Collybus tranches purchased by Commonwealth-managed funds.[146]   Based on this discussion with Morales, Kroll understood that Commonwealth had purchased all of its funds' interest in Collybus at the same time and that Commonwealth had overpaid for other Collybus notes in exchange for underpaying for the A2 notes.[147]   This was not accurate.   Commonwealth caused its funds to purchase their interests in the Collybus C, D, and Equity tranches in connection with the Collybus closing on November 7, 2007 and did not purchase the A2 notes until June 2008.[148]   Based on the information provided by Defendants, as of June 30, 2008, Kroll valued the A2 tranche at 88% of par value, even though the Commonwealth-managed funds had agreed to purchase the A2 notes at 72.75% of par value earlier that month.[149]

---

[145]     Ex. 72, December 9, 2010 Investigative Testimony of Josette Ferrar ("Ferrar Inv. Test."), at 57:11-58:8; Ex. 7, Morales May 13, 2014 Dep., at 255:18-256:20.

[146]     Ex. 72, Ferrer Inv. Test., at 112:10- 114:2.

[147]     *Id.* at 113:3- 114:2.

[148]     Ex. 13, Broyles II Answer, at ¶ 38; *see also* Ex. 14, Broyles II Complaint), at ¶ 38; Ex. 1, Answer at ¶ 55; Ex. 2, Complaint at ¶ 55.

[149]     Ex. 1, Answer at ¶ 55; Ex. 2, Complaint at ¶ 55; Ex. 73, OCIE-MIRO-0048974-75, July 17, 2008 email from Marsh to Morales, re. Draft CDO Calculations; Ex. 74, OCIE-MIRO-0048976-80, June 30, 2008 Portfolio Valuation Analysis, at OCIE-MIRO-0048980; Ex. 66, OCIE-MIRO-0245252-67; Ex. 67, CAN00101994, June 4, 2008 electronic chat between Perini and Matthews.

**Commonwealth's Form ADV Falsely Stated that It Did Not Engage in Cross-Trades**

85.     Commonwealth's Form ADV Part II, dated March 26, 2008, stated that Commonwealth "does not execute cross trades with any CA Fund or Sand Spring Fund."[150] Commonwealth's Compliance Manual in effect at the time also prohibited cross-trades between Commonwealth-managed funds.[151]

**Commonwealth Did Not Maintain Required Trading Records**

86.     Commonwealth failed to "make and keep true, accurate and current" records of orders for the purchase or sale of securities, including the terms and conditions of the order, the person who recommended the transaction to the client, and the person who placed the order.  The Commonwealth-managed funds' trading records did not identify, among other matters, the person recommending each transaction, and often indicated the wrong person as the one who placed the order.

87.     Noel Caldwell was an employee of Commonwealth who performed various operational duties, including those associated with settlement of all of Commonwealth's trades.[152] There were multiple Commonwealth employees who were authorized to place trades on behalf of Commonwealth's funds.[153]  Regardless of which of those Commonwealth employees recommended a trade, Caldwell used a stamp to document the trader who had recommended the trade, but always stamped that the trade was recommended by Morales, whether it actually was or not.[154]

---

[150]     Ex. 1, Answer at ¶ 32; Ex. 2, Complaint at ¶ 32.

[151]     Ex. 1, Answer at ¶ 33; Ex. 2, Complaint at ¶ 33.

[152]     Ex. 75, June 24, 2010 Investigative Testimony of Noel Caldwell ("Caldwell Inv. Test."). at 11:22 -12:11, 19:6-19:18.

[153]     Ex. 3, Morales Aug. 26, 2009 Inv. Test., at 14-15.

[154]     Ex. 75, Caldwell Inv. Test., at 22:5-22:11, 29:25-30:12, 52:1-59:7.

88.    In addition, Caldwell also used her personal email accounts to effect trades –
including the June 2008 cross-trades – and Commonwealth kept no records of those
communications.[155]


Dated:  September 15, 2016                    Respectfully submitted,


                                             */s/ Stephan J. Schlegelmilch*
                                             Cheryl L. Crumpton
                                             Stephan J. Schlegelmilch
                                             Jonathan P. Hooks
                                             Gary M. Zinkgraf
                                             U.S. SECURITIES AND EXCHANGE COMMISSION
                                             100 F Street, N.E.
                                             Washington, DC 20549
                                             Telephone: (202) 551-4935 (Schlegelmilch)
                                             E-mail: SchlegelmilchS@SEC.gov

                                             John J. Gaupp, LBN 14976 (as local counsel)
                                             UNITED STATES ATTORNEY'S OFFICE
                                             777 Florida Street, Suite 208
                                             Baton Rouge, LA 70801
                                             Telephone: (225) 389-0443
                                             Email: john.gaupp@usdoj.gov

---

[155]    *Id.* at 181:3-182:4, 184:8-85:16.